# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**EDMUNDO TELLES**,

     Plaintiff,

                                  **No. CV 10-800 LFG**

vs.

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security**,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Edmundo Telles's *Motion to Reverse and Remand for a Rehearing, with Supporting Memorandum* [Doc. 20], filed April 29, 2011. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court, deeming the motion well-taken, grants the motion.

## I.   BACKGROUND

On July 7, 2008, Plaintiff Edmundo Telles filed an application for disability insurance benefits, claiming he became disabled on September 15, 2007 as a result of generalized anxiety disorder, or GAD,[1] and sleep-related issues. [AR at 9, 18]. In a *Disability Report* completed on October 9, 2008, Mr. Telles explained that he worked as a real estate broker

---

[1] General anxiety disorder may be diagnosed "when a person worries excessively about a variety of everyday problems for at least 6 months."  See http://www.nimh.nih.gov/health.  Generalized anxiety disorder often is accompanied by depression and/or substance abuse, and physical symptoms of the condition include, but are not limited to, fatigue, headaches, muscle tension, muscle aches, difficulty swallowing, trembling, twitching, irritability, and sweating.  See id.  Medication and cognitive-behavioral therapy commonly are used to treat this condition.  See id.

from 1996 until 2007, but that since the onset of his illness, he was unable to "focus very long without getting panic attacks[,]" and stopped working on November 30, 2007.[2]  [AR at 162-163].  The *Disability Report* reveals that, beginning in March 2007, Mr. Telles was seen at the University of New Mexico ("UNM") Family Health Clinic, where he was prescribed Lexapro, Clonazepam, and Buspirone.[3]  As of the date that he completed the *Disability Report*, Mr. Telles was scheduled for an upcoming appointment with the UNM Mental Health Center, though he had not yet gone in for evaluation.  [AR at 164-165].

A *Mental Residual Functional Capacity Assessment* ("the mental RFC assessment") of Mr. Telles was prepared on November 17, 2008 by medical consultant P. Cherry.  In all but 6 of the 20 relevant categories, Mr. Telles was assessed as "not significantly limited;" in the remaining categories, he was deemed "moderately limited."[4]  [AR at 262-263].  In the section captioned "Functional Capacity Assessment," the medical consultant noted that Mr. Telles "retain[ed] the ability to perform detailed but not complex tasks." [AR at 264].

---

[2]  There seems to be contradictory evidence in the record with respect to Mr. Telles work history. Notwithstanding the representation in his *Disability Report* that he worked in real estate until 2007, at his disability hearing, Mr. Telles testified that he stopped working as a realtor in 2006 and in, August and September of 2007, was employed as a motorcycle salesman. [AR at 283, 286-292].  Additionally, in the Disability Report, Mr. Telles states that he became unable to work on September 15, 2007, but that he stopped working on November 30, 2007. [AR at 162.

[3]  Lexapro is a selective serotonin reuptake inhibitor ("SSRI") that is used to treat depression and generalized anxiety disorder.  Clonazepam is a benzodiazepine that is used to control panic attacks. Buspirone also is used to treat anxiety disorders.  See http://www.ncbi.nlm.nih.gov/pubmedhealth.

[4]  The six categories in which the medical consultant assessed Mr. Telles as "moderately limited" included ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) sustain an ordinary routine without special supervision; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and (6) interact appropriately with the general public. [AR at 262-263].

The benefits application was denied, and on January 20, 2009, Mr. Telles filed a *Request for Reconsideration*, stating that (1) his doctors recently added a diagnosis of obsessive-compulsive disorder ("OCD"); (2) his doctors did not "really seem to realize the extent of [his] generalized anxiety disorder[;]" and (3) his condition was more serious than his health care providers realized. [AR at 53].  In a *Disability Report—Appeal* completed contemporaneously with his reconsideration request, Mr. Telles stated that he was seeing Dr. Bobbita Nag at the UNM Mental Health Center for the treatment of GAD and OCD and continued to take Clonazepam, but was now also taking Zoloft.[5] [AR at 146-149].  Mr. Telles explained that the combination of his conditions caused "extreme anxiety when trying to focus on even the simplest tasks[,]" as well as trouble with concentration and memory. [AR at 150].  He repeated his assertion that his providers did not seem to understand the degree to which the GAD and OCD affected his ability to find and keep work, and expressed doubt that those unafflicted with these conditions could truly relate to or understand what he was experiencing. [AR at 151-152].

In a *Function Report* dated February 9, 2009, Mr. Telles explained that the GAD and the OCD affected his sleep inasmuch as he experienced "high anxiety, nightmares[, and] very broken sleep," tending to wake up sweating. [AR at 139].  He described himself as "edgy, impatient, defensive, [and] short-tempered[,]" and noted that he was fired from his last job as a motorcycle salesman for arguing with one co-worker and nearly engaging in a fist fight

---

[5]  Zoloft is another SSRI that is used to treat depression and OCD.  <u>See</u> <u>http://www.ncbi.nlm.nih.gov/pubmedhealth.</u>

with another. [AR at 143-144].  Mr. Telles stated that he did not handle stress or changes in

routine well, was less sociable, and was "talking to [him]self a lot more [and] just acting

strange." [AR at 143-144].  On the other hand, Mr. Telles made a point of trying to go to

church as often as possible, and visited with his children and grandchildren two to three times

per week, depending on their schedules. [AR at 142].  In sum, Mr. Telles stated:

> My condition is difficult to explain to someone who hasn't ever
> experienced it . . . I probably look like I'm ok on the outside just
> by looking at me, but on the inside I'm suffering tremendously
> . . . It's like a silent illness that [a]ffects my whole person and is
> causing havoc in my life. . . .

[AR at 145].

The *Request for Reconsideration* was denied on February 12, 2009. [AR at 9].  On

May 22, 2009, a second *Disability Report—Appeal* was completed on Mr. Telles's behalf by

Social Security Administration Claims Representative Noelle Erenstein. [AR at 130-137].

In this report, through which he requested a hearing before an Administrative Law Judge

("ALJ"), Mr. Telles explained that his situation had worsened since his last disability report,

and also that he was preparing to begin treatment with a new psychiatrist.  [AR at 130].  In

addition to the Zoloft, Buspirone, and Clonazepam, Mr. Telles now was also taking

Trazodone,[6] which was causing low energy, headaches, and a "hangover effect." [AR at

133].  By this time, Mr. Telles described himself as unable to work at all, and having a very

hard time functioning. [AR at 134].  He explained that the GAD and the OCD were affecting

_____

[6] Trazodone is a serotonin modulator used to treat depression. See
http://www.ncbi.nlm.nih.gov/pubmedhealth.

his eating habits, as well as his ability to manage his finances, and that he had become "more of a loner."  [AR at 135].

The ALJ held a hearing on November 5, 2009, at which Mr. Telles appeared and represented himself.  Mr. Telles testified that, before beginning a career in real estate, he worked in the family furniture business from 1977 until 1992.  He explained that he endured "some pretty traumatic experiences between 1989 and 1991" when (1) his only son was diagnosed with leukemia at age 5; (2) his daughter was fatally struck by a car; (3) Mr. Telles himself was diagnosed with a tumor in his left temporal lobe and underwent surgery; and (4) Mr. Telles "went through a pretty heavy duty" separation, followed by a divorce. [AR at 276-277].  It was at that time that Mr. Telles wound down the family business, and lived until approximately 1995 off of investment income. [AR at 277].

According to Mr. Telles, when "things had kind of run out[,]" he decided to study for his realtor's license, which he secured in 1996.  He then went to work with Vaughan Company Realtors.  Mr. Telles described working in real estate as being "a lot harder than [he] thought it was ever going to be, a lot harder[,]" but also noted that he was "a pretty good producer." [AR at 279].  In 1997, Mr. Telles joined Better Homes and Gardens/Coldwell Banker as a broker and estimated that at that time he "was probably selling like four to five million a year in real estate. . . ." [AR at 280].  Notwithstanding, at this time, Mr. Telles found himself unable to file his tax returns, explaining that, between 1997 and 2001, he "just couldn't get [him]self to do them . . . just could not get [him]self to, to get [his] stuff together and take them to a bookkeeper, an accountant, somebody to do his taxes. [He] just couldn't."

[AR at 281].

Although he believed he was grossing between $55,000 and $100,000 at that time, in 2002 Mr. Telles was selling less and less real estate, as the market was "really slowing down." [AR at 283].  Mr. Telles testified to having panic attacks at that time. [AR at 283].  By approximately 2004, Mr. Telles was hardly selling any real estate and, in 2006, he received his last commission.   [AR at 283].  It was then, testified Mr. Telles, when "real estate was really, really slow[,]" that he received an e-mail from Thunderbird Harley-Davidson in Albuquerque, stating that the store was hiring.  Mr. Telles applied, interviewed, and was offered a job as a salesman. [AR at 285-285].   Mr. Telles began work with Thunderbird in August 2007, but stated that problems started when he and the other salespeople "were really bombarded with a lot of new information, new things, and [he] started to get stressed out about that." [AR at 286-287].  In September 2007, Mr. Telles was let go from Thunderbird Harley-Davidson for reasons that are not entirely clear from his testimony.[7] [AR at 290-292].   However, it appears that in the time leading up to his discharge, Mr. Telles had a number of disagreements with co-workers. [AR at 287-292].  In any event, by the time he left Thunderbird, Mr. Telles was experiencing sleep disturbances, cold sweats, and "mega anxiety like [he] never felt before."  [AR at 292].

---

[7]  At the hearing, the following colloquy took place between the ALJ and Mr. Telles:

Q      So did you end up quitting or did they fire you?
A      Well, he wanted to fire me.  Well, he told me that I'm going to
       have to let you go.  Okay.  So I guess that's a firing.
Q      Okay.

[AR at 292].

According to Mr. Telles, he assumed that after he left Thunderbird, the anxiety would go away, but that did not happen.  Instead, he continued to feel what he described as "a very intense painful silent suffering" so extreme that he considered suicide. [AR at 293].  When this anxiety failed to taper off, Mr. Telles decided to see his doctor, who initially diagnosed generalized anxiety disorder, and then obsessive-compulsive disorder. [AR at 293-296].  Mr. Telles testified to having been prescribed Lexapro, Zoloft, and Risperidone,[8] describing the side effects of these medications as including hot flashes and strange dreams. [AR at 296].  Mr. Telles explained that, on an ordinary day, he wakes up, prepares breakfast for himself, then watches some television.  Depending on the weather, he takes up to a 30-minute walk around his neighborhood to get sun and air.  When he returns, he prepares lunch, after which he cleans up because he does not like a messy kitchen "at all."  [AR at 297-298].  Mr. Telles testified that he does chores, goes grocery shopping, and tries to do yard work, which he "really enjoy[s]." [AR at 298].

When questioned as to his physical abilities, Mr. Telles emphasized that, notwithstanding aches and pains, he was not "disabled with [his] life." [AR at 299].  Instead, his condition was "going on inside." [AR at 299].  When asked whether he thought that he could return to work someplace not quite as pressure-filled as Vaughan or Thunderbird, Mr. Telles replied that "on a good day, [he] probably could work a little[,]" but that he never could predict which days would be good and on which days he would be "feeling lousy [and

---

[8]  Risperidone is an antipsychotic medication used to treat such mental illnesses as schizophrenia, mania, and mixed episodes of mania and depression.  See http://www.ncbi.nlm.nih.gov/pubmedhealth.

not] want[ing] to get up [or] do anything." [AR at 299].  For example, predicted Mr. Telles, he would not be able to work an eight-hour day, five days a week, because he would not be able to keep up with that schedule. [AR at 300].  He anticipated calling in sick and, on days that he was able to make it to work, appearing "[m]aybe by 10:30," instead of 8:00 a.m. [AR at 300].  He also explained that while working with people sometimes triggered his anxiety, he also tended to become "stressed out even for no reason." [AR at 301].

The ALJ then questioned Cornelius Ford, a vocational expert ("VE") who also appeared at the hearing. [AR at 301].  Mr. Ford classified Mr. Telles' former job in real estate as a semi-skilled occupation that was performed at a medium exertional level, and his former job as a motorcycle salesman also as semi-skilled, but with a light exertional level. [AR at 303].  When asked whether a hypothetical individual limited to (1) performing tasks of a detailed, but not complex, nature; and (2) working with things, as opposed to people,[9]

---

[9]  The ALJ's additional limitation of jobs in which the hypothetical individual would be restricted "to working primarily with things rather than with people" appears to lack support in the record. [AR at 304].  To be sure, when the ALJ specifically asked Mr. Telles whether "dealing with people" triggered his anxiety, Mr. Telles responded, simply, "No." [AR at 293].  Mr. Telles further explained that, for someone with generalized anxiety disorder, "there's no rhyme or reason to [the anxiety].  You have anxiety for no reason.  There's no reason.  I wake up in the morning, I have anxiety.  I go to bed at night, I have anxiety.  Everything can be fin[e] around me, I have anxiety." [AR at 295].

When the ALJ again asked, "[D]o you think that dealing with people, dealing with customers makes you more anxious, gets you[] more stressed?" Mr. Telles replied, "Well it does trigger sometimes but it's, I mean *I'm stressed out even for no reason though*." [AR at 301 (emphasis added)].

A hypothetical question must have evidentiary support for the hypothesis.  In this case, there does not seem to be a factual basis for the ALJ's asking Mr. Ford to assume that the hypothetical individual in question was "limited to performing tasks that are of a detailed nature but not complex *and additionally . . . limited to working primarily with things rather than people*." [AR at 304 (emphasis added)].  Still, any error in this regard must be deemed harmless because, in further eliminating vocations in which workers deal primarily with people, the error actually worked in Mr. Telles's favor, as well as to his benefit, since, at that point in the five-step sequential evaluation (discussed later in this *Memorandum Opinion and Order*), the burden had shifted to the Commissioner to demonstrate that, in light of his limitations, there

would be able to perform Mr. Telles's past relevant work, Mr. Ford replied, "No, sir.  The past occupations dealt predominantly with people." [AR at 304].   However, Mr. Ford testified that there did exist in the national and regional economies semi-skilled jobs performed at a light exertional level that the hypothetical individual could perform, such as (1) shipping-order clerk; (2) tape librarian; and (3) file clerk. [AR at 304-305].  Mr. Ford also opined, however, that an individual employed in these positions who consistently missed work or came in late because of "bad days" likely would be terminated. [AR at 305].

Mr. Telles also questioned Mr. Ford, asking, first, whether any of the jobs offered by Mr. Ford as examples required the use of a computer.  Mr. Ford believed that the positions of shipping-order clerk and tape librarian were more likely than that of file clerk to require computer use.  [AR at 306].  Mr. Telles then explained that such jobs would cause him "mega problems" because he was unable to sit in front of a computer for more than 15 minutes at most. [AR at 307].  As Mr. Telles explained, "[i]f it requires being, sometimes . . . being still, focusing, concentrating, logging in and waiting for the computer to come online, it drives me nuts." [AR at 307].

The ALJ then asked Mr. Ford if there existed other jobs in the national and regional economies open to hypothetical individuals with the above-described limitations, *plus* the additional limitation of inability to work with a computer.  Mr. Ford offered the unskilled, light-exertional occupations of (1) wire stripper; (2) plastic press molder; and (3) polarity

---

were jobs in the regional and national economies that Mr. Telles could perform.  See Chroniak v. Golden Inv. Corp., 983 F.2d 1140, 1148 (1st Cir. 1993) (explaining "beneficial error" as one that places on the party with the burden of proof a more substantial onus than that party normally would bear).

tester. [AR at 308].  Mr. Telles posed some questions about the work environments of the positions in question (*e.g.*, whether they were confined or open, clean or dirty), and also asked whether workers who performed in such jobs were expected to meet production quotas. [AR at 309-311].  The ALJ then asked whether these were "fast[-]paced production jobs" with high levels of stress and high-level demands.  In response, Mr. Ford explained:

> [T]he places that I have seen, sir, they do have their minimums that they expect and they arrive at those based on the production rates of people in the past, the difficulty of the, of the job itself and if a person is within that range, if a person consistently drops below day after day below the level of what other people are producing, then those people are usually not kept around.

[AR at 312].  At the same time, clarified Mr. Ford, these were not jobs where the employee was "under . . . pressure to do a very detailed task very, very quickly [with] a great deal of concentration." [AR at 312].  Following Mr. Ford's testimony, the hearing was adjourned.

In a thoughtful and well-written decision dated December 14, 2009, the ALJ denied Mr. Telles's application for benefits, concluding that Mr. Telles was not disabled for purposes of sections 216(i) and 223(d) of the Social Security Act.  Following the five-step sequential evaluation process for determining whether an individual is disabled, the ALJ found that (1) Mr. Telles was not at the time of the hearing—and had not since September 15, 2007 been—engaged in substantial gainful activity; (2) Mr. Telles experienced severe impairments in the form of anxiety disorder and obsessive-compulsive disorder, and non-severe impairments in the form of asthma and diabetes; (3) none of these impairments, individually or combined, equaled a listed impairment in 20 C.F.R. Part 404, Subpart P,

Appendix 1; (4) Mr. Telles's impairments prevented him from performing his past relevant work as a realtor; but (5) Mr. Telles possessed the residual functional capacity ("RFC") to perform, with certain limitations, a full range of work existing in the national and regional economies. [AR at 9-18].

On December 23, 2009, Mr. Telles filed a *Request for Review of Hearing Decision/Order*. [AR at 5]. The ALJ's decision was upheld—and Mr. Telles's request for review denied—in a *Notice of Appeals Council Action* dated June 24, 2010. [AR at 2-4]. With the Appeals Council's denial, the ALJ's decision became the decision of the Commissioner. See Cowan v. Astrue, 552 F.3d 1182, 1184 (10th Cir. 2008).

On August 20, 2011, Mr. Telles, proceeding *pro se*, filed a civil rights complaint, naming the Social Security Administration, Office of Disability Adjudication and Review as defendant. In his complaint, Mr. Telles appeared to allege that his constitutional rights had been violated as a result of the Appeals Council's failure to consider a March 31, 2010 letter from Dr. Dirk de Brito, of the UNM Department of Psychiatry, stating that (1) Mr. Telles is Dr. de Brito's patient; (2) Dr. de Brito diagnosed Mr. Telles with GAD; and (3) the condition of GAD impacted Mr. Telles ability to work. [See Doc. 1 at 3; attached letter from Dirk de Brito, MD MPH]. On January 25, 2011, Mr. Telles filed an amended civil rights complaint, asserting that, in addition to denying him benefits, the Social Security Administration also failed to credit him with self-employment income reported to it by the Internal Revenue Service. [See Doc. 13 at 2-4].

On March 28, 2011, counsel entered an appearance on behalf of Mr. Telles and, on April 29, 2011, filed the motion to reverse that is now before the Court. [See Docs. 13, 20]. In his motion, Mr. Telles argues that the matter should be reversed and remanded to the ALJ because (1) the ALJ's decision is not supported by substantial evidence; (2) the ALJ did not apply the correct legal standards; and (3) the Commissioner failed to carry his burden of proof. [See Doc. 20 at 1].   More specifically, Mr. Telles contends that the ALJ erred in failing to order a consultative psychological evaluation; neglecting to account for all of Mr. Telles's limitations in the hypothetical questions posed to the VE; and in assessing Mr. Telles's credibility. [See generally Doc. 24].

## II.   ANALYSIS

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the denial of benefits to Mr. Telles only if it determines that the denial is (1) not supported by substantial evidence, or (2) based on legal error.  See Kauser v. Astrue, 638 F.3d 1324, 1326 (10th Cir. 2011). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Raymond v. Astrue, 621 F.3d 1269, 1271-72 (10th Cir. 2009) (internal quotations omitted). By contrast, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).

In order to determine whether a decision is supported by substantial evidence, the Court must "meticulously" examine the record as a whole.  Musgrave, 966 F.2d at 1374.

12

However, the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  Id.  Additionally, while

> [t]he record must demonstrate that the ALJ considered all of the evidence[. . . ] an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

In assessing whether a claimant is disabled,[10] the ALJ is required to follow a five-step sequential evaluation process, with the claimant shouldering the burden of establishing a prima facie case of disability at steps one through four.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).  At step one, the claimant must demonstrate that he is not presently engaged in substantial gainful activity.  Step two requires the claimant to show that he has a medically severe impairment or combination of impairments.  If, at step three, the claimant shows that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits.  If the claimant cannot meet a listing at step three, he continues to step four, which requires him to show that the impairment (or combination of impairments) prevents him from performing his past work.  If the claimant satisfies his burden, the burden of proof shifts to the Commissioner at step five "to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the national economy, given his age,

---

[10]  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §§ 423(d)(1)(A).

education, and work experience." Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005).

In every social security case, the ALJ id obliged  to ensure that an adequate record is developed during the disability hearing consistent with the issues, and this duty is heightened where, as here, the claimant appears at the hearing unrepresented.  See Henrie v. U.S. Dept. of Health & Human Servs., 13 F.3d 359, 360-361 (10th Cir. 1993).  Moreover, the ALJ's independent duty to develop the record is triggered if he "find[s] any piece of evidence to be ambiguous or difficult to interpret."  Agadzhanyan v. Astrue, 2009 WL 4882660, at *1 (9th Cir. Dec. 10, 2009) (unpublished).

Additionally, "where the medical evidence in the record is inconclusive . . . a consultative examination is often required for proper resolution of a disability claim." Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).  In such situations, the difficult question that presents itself is "what quantum of evidence a claimant must establish of a disabling impairment or combination of impairments before the ALJ will be required to look further."  Id.  While '[i]t is beyond dispute that the burden to prove disability in a social security case is on the claimant[,]" id. at 1164, agency regulations support that, when the existing evidence is insufficient to allow the ALJ to render a decision, it is incumbent upon the ALJ to delve deeper so as to procure the needed additional information.  To be sure, the regulations state that "[i]f the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense."  20 C.F.R. § 404.1512(f).  Situations requiring a consultative examination include , but are not

limited to, those in which (1) the entirety of the medical and non-medical evidence is not sufficient to support a decision on the claim; (2) highly technical or specialized medical evidence that is needed is not available from the claimant's treating or other medical sources; and (3) an insufficiency in the evidence must be resolved.  See 20 C.F.R. § 404.1519a(b).

The Tenth Circuit instructs that, in assessing how much evidence a claimant must adduce to trigger the ALJ's obligation to investigate further, "the starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation."  Hawkins, 113 F.3d at 1167.  If the claimant comes forth with evidence sufficient to suggest a reasonable possibility that a severe impairment exists, "it then, and only then, becomes the responsibility of the ALJ to order a consultative examination *if such an examination is necessary or helpful to resolve the issue of impairment*."  Id. (emphasis added).

In this case, the ALJ stated that "there are no treating source opinions regarding specific functional limitations." [AR at 15].  The ALJ went on to state that (1) Mr. Telles's primary care provider, Michael Servilla, wrote a note in May 2008 explaining that Mr. Telles's anxiety disorder prevented him from focusing and might cause difficulty in his ability to find and maintain work [AR at 169]; (2) in a form she prepared for the New Mexico Income Support Division, Dr. Nag confirmed that, due to obsessive-compulsive disorder, Mr. Telles could not work for a 6-month period in 2009 [AR at 168]; and (3) in a July 13, 2009 letter to the IRS, Nancy Barickman, Mr. Telles's grief counselor, explained that the

15

individual traumas Mr. Telles experienced between 1987 and 1991 (his daughter's death, his son's leukemia diagnosis, Mr. Telles' brain tumor, and Mr. Telles's divorce) rendered him unable to organize his business affairs which, in turn, caused him not to file tax returns. [AR at 171]. Mr. Telles contends that the ALJ's statement about the lack of treating source opinions regarding specific functional limitations triggered his duty to order a consultative psychological evaluation, and that the failure to do so constitutes reversible error. [See Doc. 20 at 3-4].

A mental impairment generally is considered to be a nonexertional impairment, meaning it is an impairment that is present whether the claimant is attempting to perform any physical requirements of his job, and is "present at all times in a claimant's life, whether during exertion or rest." Gory v. Schweiker, 712 F.2d 929, 930 (4th Cir. 1983). Moreover, "it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings. Determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace is often extremely difficult." S.S.R. 85-15, 1985 WL 56857, at *5 (1985). To be sure,

> [t]he reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. *The mentally impaired may cease to function effectively when facing such demands as getting to work regularly*, having their performance supervised, *and remaining in the workplace for a full day*. A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirements of even

16

so-called "low-stress" jobs.

> Because response to the demands of work is highly
> individualized, the skill level of a position is not necessarily
> related to the difficulty an individual will have in meeting the
> demands of the job. A claimant's condition may make
> performance of an unskilled job as difficult as an objectively
> more demanding job. for example, a busboy need only clear
> dishes from tables. But an individual with a severe mental
> disorder may find unmanageable the demands of making sure
> that he removes all the dishes, does not drop them, and gets the
> table cleared promptly for the waiter or waitress. Similarly, an
> individual who cannot tolerate being supervised may not be able
> to work even in the absence of close supervision; the knowledge
> that one's work is being judged and evaluated, even when the
> supervision is remote or indirect, can be intolerable for some
> mentally impaired persons. Any impairment-related limitations
> created by an individual's response to demands of work,
> however, must be reflected in the RFC assessment.

Id. at *6 (emphasis added).

The ALJ specifically referenced the noted limitation in medical consultant Cherry's

mental RFC assessment during his questioning of Mr. Ford, asking whether a hypothetical

individual of Mr. Telles' age, education, and work history "who is limited to performing

tasks that are of a detailed nature but not complex" would be able to perform any of Mr.

Telles's past work, or if there would "be jobs in the national and regional economy that such

an individual could perform[.]" [AR at 304].  It is this Court's belief that Mr. Ford's reliance

on a hypothetical that, in turn, was based on medical consultant Cherry's opinion and noted

limitation does not, under the circumstances of this case, amount to substantial evidence

sufficient to support the denial of benefits, particularly where there was evidence in the

record that should have been examined more closely because it was sufficient to raise

questions as to how, precisely, generalized anxiety disorder and OCD impacted Mr. Telles's ability to function in the workplace.

As an initial matter, nothing in the administrative record supports a finding that medical consultant Cherry was anything more than a non-examining, non-treating provider, yet "[t]he opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (where no medical evidence explains how claimant's impairments affect his ability to function, ALJ who relies on opinions of non-treating, non-examining physicians "does not satisfy [his] duty to fully and fairly develop the record."). Consequently, "the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits." Id. In Nevland, the Eighth Circuit concluded that the ALJ committed reversible error in failing either to (1) request opinions from Jerold Nevland's treating physicians, or (2) order consultative examinations to determine just how his impairments affected his ability to function.  Id.  As the court pointed out, "[i]n spite of . . . numerous treatment notes . . ., not one of Nevland's doctors was asked to comment on his ability to function in the workplace."  Id.

In the instant case, the ALJ accepted Mr. Ford's opinion that there existed in significant numbers in the regional and national economies jobs that could be performed by a hypothetical individual of Mr. Telles's age, education, and work history who could "perform detailed but not complex tasks primarily with things and should avoid computer use." [AR at 14].  At the same time, however, the ALJ noted that (1) Dr. Nag "prepared a

18

form for the New Mexico Income Support Division stating that Mr. Telles *could not work*

*for six months (from February 2009) due to OCD*[;]" (2) Mr. Telles's primary care provider,

Michael Servilla, similarly wrote a note in May 2008 explaining that Mr. Telles "had a

chronic anxiety disorder which caused him difficulty in focusing *which might cause some*

*difficulties finding and maintaining employment*[;]" and (3) Mr. Telles's grief counselor,

Nancy Barickman, wrote a letter to the IRS stating that Mr. Telles was "affected by a series

of tragic events in the late 1980s and early 1990s [including the death of one child and the

leukemia diagnosis of another], which prevented him from filing his tax returns for many

years.[11, 12]   [AR at 15-16 (emphasis added)].

Additionally, treatment notes raise questions as to how, exactly, Mr. Telles's

generalized anxiety disorder and OCD affected his ability to function in the workplace.  See

_____

[11]  In her letter dated July 13, 2009, Ms. Barickman also advised that "[t]he debilitating effects of a sudden, unexpected death, particularly of a child are well documented and it is not out of the ordinary that [Mr. Telles] would continue to be suffering from these effects." [AR at 171].

[12]  In addition to these three treating-provider documents, Mr. Telles attached to his *pro se* civil rights complaint a letter from his psychiatrist, Dr. Dirk de Brito, explaining that he diagnosed Mr. Telles with generalized anxiety disorder, which "impacts [Mr. Telles's] ability to work." [Doc. 1; attached letter from Dirk de Brito, MD, MPH].  Mr. Telles represents (and the Commissioner does not appear to contest) that this undated letter was written on March 31, 2010. [See id. at 3].  Accordingly, the letter could not have been considered by the ALJ, who conducted the disability hearing on November 5, 2009, and issued his written opinion on December 14, 2009. [AR at 9-19].  Dr. de Brito's letter should, however, have been considered by the Appeals Council, which denied Mr. Telles' request for review in a decision dated June 24, 2010. [See Doc. 1 at 3 (alleging, as a violation of Mr. Telles's civil rights, that "[t]he Appeals Council did not consider [his] letter submitted March 31, 10 by Dr. de Brito, *which [he] hand carried to the ABQ. Cutler Social Security Office*. . . ." (emphasis added)].  It is the opinion of this Court that Dr. De Brito's assertion that GAD "impacts [Mr. Telles's] ability to work" serves as further evidence of an ambiguous record or, at the very least, of the existence of an issue best resolved by further investigation and record development.  See Hawkins, 113 F.3d at 1167.  Further, the Appeals Council's apparent failure or refusal to consider Dr. be Brito's letter is a part of the Commissioner's "final decision" and, thus is subject to judicial review under § 405(g).  See Ingram v. Comm'r of Social Sec. Admin., 496 F.3d 1253, 1265 (11th Cir. 2007).

Bell v. Heckler, 609 F.Supp. 213, 215 (W.D. Mo. 1985) ("It is the duty of the Secretary to develop the record, which entails inquiring into the specific limitations caused by the plaintiff's impairments. . . ."). For example, in a treatment note from October 14, 2008, Mr. Telles reported "that his increasing anxiety attacks ha[d] disabled him to the extent that he [could not] go to work anymore[,and that] while he was working in 2007[,] whenever he used to have these attacks he had the overwhelming sense of needing to run away from the workplace." [AR at 231]. In a treatment note dated November 24, 2008, Mr. Telles's provider stated that Mr. Telles exhibited "significant anxiety and . . . significant ritualistic behavior with consequences of severe anxiety if he [did] not perform these things. . . ." [AR at 229]. In a treatment note from January 5, 2009, Dr. Nag echoed this assessment of Mr. Telles as significantly anxious and ritualistic, notwithstanding that the medications Zoloft and Klonopin[13] had helped his anxiety "come down to a good extent." [AR at 226]. Finally, in a treatment note from July 7, 2009, Mr. Telles reported continued anxiety, "which he describe[d] in a somatic fashion as 'silent pain' in his chest that radiate[d] out." [AR at 201]. Given such evidence of treating providers' first-hand observations of Mr. Telles's condition, this Court believes that the ALJ incurred the obligation either to seek opinions from those who actually treated Mr. Telles, or order a consultative psychological evaluation. See Nevland, 204 F.3d at 858.

---

[13]   Klonopin is the brand name for Clonazepam, a benzodiazepine used to control panic attacks. See supra n.2.

Under the circumstances, the Court finds that the evidence before the ALJ was sufficiently inconclusive to trigger the ALJ's duty to develop the record further by either obtaining additional medical evidence from Mr. Telles's treating providers or ordering a consultative examination.  See Lamb v. Barnhart, 85 Fed.Appx. 52, 57 (10th Cir. 2003) (reversing denial of benefits and remanding to allow ALJ to develop record sufficient to allow assessment of claimant's exertional and nonexertional limitations).  Given the record evidence and the absence of "treating source opinions regarding specific functional limitations[,'] [AR at 15], it would certainly be helpful to this Court, for purposes of its review of the ALJ's decision and reasoning, to have in hand a more fully developed record. See Hawkins, 113 F.3d at 1167 (once claimant presents evidence sufficient to suggest reasonable possibility that severe impairment exists, it then "becomes the responsibility of the ALJ to order a consultative examination if such an examination is necessary or helpful to resolve the issue of impairment.").  Instead, the Court determines that, in its current state, the record simply is not sufficient to support a decision on Mr. Telles's claim.  See 20 C.F.R. § 404.1519a(b).  Finally, while it is the ALJ's duty to ensure a fully and fairly developed record even where the claimant is represented by counsel, see, e.g., Baca v. Dep't of Health and Human Servs., 5 F.3d 476, 480 (10th Cir. 1993), that duty, as previously stated, is heightened where, as here, the claimant appears at the hearing unrepresented.  See Henrie, 13 F.3d at 360-361.

## III.   CONCLUSION

In sum, this Court is fully aware of the fact that its role in reviewing the determination of the ALJ is neither to reweigh the evidence, nor to substitute its judgment for that of the Commissioner.  See Grede v. Astrue, No. 10-6260, slip op. at 4 (10th Cir. Sept. 27, 2011). On the other hand, it *is* this Court's obligation to reverse and remand where, as here, it concludes that the record before the ALJ was not sufficiently developed to permit a denial of benefits, particularly where the claimant appears before the ALJ without the benefit of counsel.  See, e.g., Jordan v. Heckler, 835 F.2d 1314, 1315 (10th Cir. 1987) (ALJ's basic duty to inform himself about facts relevant to his decision is heightened where claimant is not represented by an attorney).  Thus, while on remand the ALJ may reach the same result as he did originally, he must do so on a fully and fairly developed record.  For these reasons, the Court will grant Mr. Telles's motion.

**IT IS, THEREFORE, ORDERED** that Plaintiff Edmundo Telles's *Motion to Reverse and Remand for a Rehearing, with Supporting Memorandum* [Doc. 20] is **GRANTED;**

**IT IS FURTHER ORDERED** that this matter be, and hereby is, **REMANDED** for further administrative proceedings consistent with this *Memorandum Opinion and Order*.

**SO ORDERED** this 4th day of October, 2011, in Albuquerque, New Mexico.

_____
*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge